UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED
APR 19 2002
NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

RICHARD L. STETHEM, et al.,

Plaintiffs,

v.

THE ISLAMIC REPUBLIC OF IRAN, et al.,

Defendants.

Civil Action No. 00-0159 (TPJ)

KURT CARLSON, et al.,

Plaintiffs,

v.

THE ISLAMIC REPUBLIC OF IRAN, et al.,

Defendants.

Civil Action No. 00-1309 (TPJ)

## DECISION AND ORDER

On the morning of Friday, June 14, 1985, TransWorld Airlines ("TWA") Flight No. 847, a Boeing 727, took off from Athens, Greece, bound for Rome, Italy, with a full complement of 143 passengers and a crew of eight. On board were U.S. citizens Robert Stethem, Kurt Carlson, Stuart Dahl, Jeffery Ingalls, Clinton Suggs, Tony Watson, and Kenneth Bowen. All were U.S. military personnel, enroute back to the United States from various assignments abroad and coincidentally aboard the same plane traveling in civilian dress.

Shortly after takeoff the plane was commandeered at gunpoint by at least two hijackers, also armed with hand grenades, who forced the plane to divert first to a landing for fuel in Beirut, then on to Algiers, and back once more to Beirut, finally landing dramatically at night in Beirut about 16 hours after the flight had commenced. During the journey several of the servicemen were brutally beaten by their captors. One was executed by gunshot to the head and his body shoved from the plane onto the tarmac at the Beirut airport. Eventually debarked from the plane as prisoners of a local militia in Beirut, the surviving servicemen were held captive by confederates of the hijackers until June 30, 1985, when they were released to Syrian military personnel and ultimately flown home.

The airborne portion of their ordeal was characterized for some of them by excruciating pain from repeated beatings, and for all of them by stark terror in expectation of either an imminent violent death or prolonged captivity. While imprisoned in Beirut they were confined under execrable conditions, tormented with daily threats of torture and death, and vilified as citizens of a despised nation, all the while uncertain of their fate.

These two consolidated actions by the servicemen and their spouses, and by the personal representatives of the murder victim, seek to recover damages from the parties they hold ultimately responsible for these terrorist acts, the Islamic Republic of Iran and its Ministry of Information and Security, pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 et seq. Defaults were taken against defendants in both cases on December 1, 2000, and June 26, 2001, respectively, and upon the evidence adduced at an ex parte hearing before the Court October 22-26, 2001, which the Court finds to be satisfactory for the purpose, the foregoing and following facts are found pursuant to Fed.R.Civ.P. 52(a). Judgments will

consequently be entered for plaintiffs in accordance with the conclusions of law drawn therefrom.

I.

Robert Dean Stethem (Deceased)

Robert Stethem, the murder victim, was identified by the hijackers early in the flight as a U.S. serviceman. He was, in fact, a 23-year-old U.S. Navy petty officer, trained as a diver and underwater construction specialist. In June, 1985, Stethem and fellow divers assigned to Underwater Construction Team No. 1 ("UCT1"), stationed in Norfolk, Virginia, were aboard TWA 847 enroute back to the U.S. from Athens where they had spent several weeks repairing an underwater structure at a U.S. military installation nearby.

First thought to be a U.S. Marine by the hijackers (who never totally abandoned their suspicions), Stethem was taken to the front of the aircraft, his arms tightly bound, and beaten about the head and shoulders repeatedly with a pistol or an armrest wrenched from a passenger seat. He bled profusely. Although only semi-sensible, losing blood, and in obvious pain for much of the trip, he apparently never lost consciousness altogether. Upon the second landing in Beirut, Stethem was the hostage the hijackers selected for their first execution, partly to emphasize their insistence that their various demands be taken seriously, partly to manifest their hostility to Americans generally. The forward passenger door was thrown open, and one of the hijackers placed his gun to Stethem's head and fired a shot through his skull. As he was about to die he was heard to mutter an exclamation--"Oh, God"--indicating that he was aware of what was happening. His body was pushed from the open doorway to fall upon the pavement beneath the

plane where it remained for several hours.[1]

Stethem's survivors include his father and mother, Richard and Patricia Stethem; a sister, Sheryl (Stethem) Sierralta; and two brothers, Kenneth and Patrick Stethem. Although none were his dependents, the family is a remarkably close one. Filial and fraternal affection between Robert, his parents, and siblings was both mutual and intense.

The Stethems are a Navy family. Richard Stethem retired as a Senior Chief Petty Officer after a 25-year career, most of it on sea duty, and worked thereafter as a civilian employee of the Navy Department until 1995. Patricia met Richard while she herself was a sailor. Kenneth joined the Navy at age 19, became a SEAL, and retired in April, 2000, after 20 years. Patrick enlisted the day before TWA 847 was hijacked, followed his deceased brother into underwater construction, and remained a Navy diver for nearly 10 years.

The surviving Stethems last saw Robert at a family reunion in May, 1985, but were together again in June, 1985, to follow the saga of TWA 847 on CNN at the family home in Waldorf, Maryland, all the while besieged by an insatiable media horde at their doorstep. They first learned that Robert was the murdered U.S. serviceman thrown from the plane when Kenneth identified the distinctive shirt on the body on the tarmac shown on television as a shirt he had given his younger brother.

All of the Stethem family have been diagnosed as suffering from post-traumatic stress syndrome. According to the psychologist who made the diagnosis, their grief at Robert's death

---

[1]Autopsy findings disclosed that he may have remained alive for several minutes after having been shot.

remains unresolved to the present and will probably never subside.[2]

Plaintiffs Richard Stethem and Patricia Stethem, as father and mother of Robert Stethem, are the duly appointed co-personal representatives of Robert's estate. Both are U.S. citizens, as are his brothers and sister. They bring this action in the nature of a wrongful death and survival action for such damages as may be recoverable from defendants under the FSIA by reason of Robert's false imprisonment as a hostage aboard TWA 847, his torture by beating prior to his death, and his extrajudicial killing that can only be characterized as an intentional, deliberate and premeditated act of murder. These damages include, as established by numerous prior decisions under the FSIA, the net economic loss to Robert's estate; compensation for his ante mortem pain and suffering; solatium for his immediate surviving kin; and punitive damages to chasten the perpetrators of these acts of terrorism and deter their repetition by others.

Kurt and Cheryl Carlson

Kurt and Cheryl Carlson are U.S. citizens, married since 1969, who reside in Illinois, where Kurt Carlson is a building contractor. In 1985, Carlson was a major in the U.S. Army Reserve, and he volunteered for an active duty assignment in Cairo, Egypt, to make a preliminary survey of facilities in preparation for forthcoming joint U.S.-Egyptian military exercises. On June 14, 1985, Carlson was enroute home from Egypt aboard TWA 847 when it landed in Athens where Robert Stethem and his companions boarded.[3] Carlson, traveling alone, had acquired a standby seat in the first class cabin.

---

[2]Testimony of Dr. Dana Cable, Tr., 10/23/01, pp. 16-32; Pl. Ex. 166.

[3]TWA 847 originated in Cairo.

Ten minutes into the flight the hijackers stormed the forward section of the plane, assaulted a flight attendant, and, brandishing both a pistol and hand grenades, shouted in English, "Americans come to die!"

Carlson surreptitiously slipped his military identification out of his pocket into the seat cushion, but was eventually discovered to be in the U.S. armed forces by the hijackers following an enforced passport collection in which the absence of a passport in his name was noted.[4] At first, however, he was forced into a seat in the after cabin with all other passengers, and, like them, compelled to assume an excruciatingly uncomfortable position Carlson describes to this day as the "847 position"--hands behind head; head down, with elbows on knees--and to remain so, in total silence, whenever the plane was airborne.

Not until TWA 847 had landed in Algiers, some six hours into the flight, was Carlson singled out for special treatment. He and Stethem were marched at gunpoint to the forward cabin. His hands were bound behind him; he was blindfolded, and prodded to the cabin floor. He was then (as was Stethem) beaten at intervals about the head, shoulders, back and arms with a club. The hijackers intermittently shouted "one American must die," and they identified Carlson as the first who would do so if their demand that the plane be refueled was not complied with within successive 10- or 15-minute deadlines. Carlson fully expected to be killed. He was spared by the eventual arrival of a fuel truck, and TWA 847, once refueled, took off again for Beirut.

Following Stethem's death on the ground in Beirut, Carlson and all but one of the Navy

---

[4]All U.S. military personnel were eventually identified, and as such treated with special hostility. Had they been U.S. Marines, they would all likely have been killed.

divers were turned over to a contingent of local militia (known as Amal) who were confederated with the hijackers. They were held captive--and periodically tormented--for approximately two weeks in a filth-ridden basement dungeon in a combat zone somewhere in West Beruit.

Like most of the rest of the U.S. population, Cheryl Carlson followed the saga of TWA 847 on television, apprehensive that she would never see her husband again. When he did return she became aware of how profoundly the experience had affected him, and she has suffered with him through the manifestations of the post-traumatic stress syndrome with which he remains afflicted to the present--irrational fear, sleeplessness, nightmares, extreme irritability--and which has had a markedly deleterious effect on their marriage relationship.

Stuart and Martha Dahl

Stuart and Martha Dahl are U.S. citizens, have been married since 1974, and live in Virginia. Stuart Dahl retired from the U.S. Navy in 1997.

In June of 1995 Stuart Dahl was the senior Navy petty officer and in charge of the diver detachment returning from Greece aboard TWA 847. Although he was never singled out for physical mistreatment by the hijackers (other than a blow to the head for breaking the "847 position"), he was aware that his shipmates Stethem and Suggs were being beaten, and overheard (from his "847 position") the sounds associated with Stethem's murder.

While a captive in Beirut, as the senior enlisted man he maintained military discipline among his fellow prisoners who, under Kurt Carlson's command as the only commissioned officer present, governed themselves as if they were prisoners-of-war.

Tony and Pamala Watson

Tony and Pamala Watson have been married since 1975. Both are U.S. citizens and live

in North Carolina. Tony Watson retired from a 20-year naval career in 1998 and owns a woodworking business.

His experience was consistent with that of the other divers of UCT1, and Pamala Watson endured both the nationally televised vigil for the TWA 847 hostages, as did the other wives, and her husband's acute and chronic suffering at the memory of his ordeal once he returned home.

Kenneth and Vicki Bowen

The Bowens did not marry until 1988. Both are U.S. citizens.

Kenneth Bowen left active duty with the Navy before the end of 1985, although he remained in the Reserve. He currently works as a bridge inspector for the U.S. Department of Transportation.

Bowen was briefly confronted by one of the hijackers on the plane who accused him, with a gun to his forehead, of being a "U.S. Marine." Bowen demurred: "U.S. Navy." The hijacker said, "We kill Marines," and turned away.

Clinton Suggs and Chantal Gautier

Clinton Suggs, an American citizen, married Chantal Gautier, a Canadian, in 1982. He and Stethem were the closest of friends among the UCT1 divers, and were brought forward together by the hijackers to the first class cabin of TWA 847, and became the first to be bound, blindfolded, and beaten.

Suggs overheard, at close range, the final moments of Stethem's life, including the fatal gunshot, and a hijacker's threat to execute another hostage in five minutes if his demands of the moment were not met. Suggs knew he would be next and resigned himself to die.

Suggs and Gautier first separated in 1986 and ultimately divorced in 1991, a consequence

they both attribute directly to the personality changes Suggs underwent as a result of the events of June, 1985.

Jeffrey Ingalls

Ingalls' identity was not discovered until after the other divers and Carlson had left the plane in Beirut. Consequently, he was separated from his shipmates and held captive elsewhere in the city, but only after being forced to lie on the ground and threatened with execution for having eluded earlier identification. He was confined in a 6' by 8' closet with three other American men--all Jewish civilians--for nine days.

Ingalls remained in the Navy until 1998, retiring as a Master Chief Petty Officer and Master Diver. He now suffers from depression and lives as a recluse in New Hampshire.

II.

Aside from the physical abuse inflicted upon some of them, each of the men aboard TWA 847 share a common memory of other particularly horrific details of the ordeal. They remember the acute discomfort associated with the "847 position" and the anticipation of a blow to the head if they changed posture or tried to communicate with another passenger. They recall the odor of overflowing lavatories covered with ordure; the ignominy of relieving themselves while being observed at gunpoint by a hijacker standing at the open door; the stifling heat while the plane sat motionless for hours, unairconditioned, on a runway in the Algerian desert at midday; the virulent anti-American hatred spewed by the hijackers, especially at U.S. military personnel, and the brutality it provoked against certain of their companions.

They remember expecting to die in a plane crash when the passengers were told by the pilot that the control tower at Beirut refused permission to land the second time and had darkened

the runway.

Once off the plane in Beirut, they were herded into a line by their guards. Each remembers expecting an imminent execution by a firing squad. Then, imprisoned somewhere in the city, they recall their vermin-infested cells; the taunting guards who would awaken them at night for verbal abuse and would on occasion pretend to shoot them, then laugh at their discomfiture. The guards also proudly displayed photographs of the murdered Stethem's body lying beneath the plane. Another common memory is of being forced to witness the beating death of another unknown prisoner. They remember the spoiled food they were served, and the epidemic of dysentery that beset them all as a result.

Each of them remembers, as do the wives, the onset and persistence of the symptoms of his own peculiar case of post-traumatic stress disorder: the constant anxiety and irritability; insomnia, followed by slumber with nightmares reprising the events of June, 1985; the unexpiated guilt at having survived, yet done nothing to prevent the murder of a shipmate whom they could not possibly have saved; the irrational idiosyncracies each has developed, such as refusing to board planes with "Arabic-looking" co-passengers, carrying a tennis racket aboard a plane to be used as a weapon against any future hijackers, or sleeping on the floor, armed against nighttime intruders.[5]

III.

The hijackers--known only by the sobriquets "Crazy" and "Hitler" by the TWA

---

[5]Testimony of William W. Wood, M.D., Tr., 10/26/01, pp. 88-131; Pl. Ex. 212.

passengers at the time[6]--have been reliably identified as belonging to Hizballah, a radical Shi'ite paramilitary organization recruited, trained and financially supported by the Ministry of Information and Security ("MOIS") of the Islamic Republic of Iran. Originally affiliated with Amal, the Lebanese militia supported by Syria during the Lebanese civil war, and a frequent collaborator with Amal even after shifting allegiance to Iran following the Israeli invasion of Lebanon in 1982, Hizballah has been implicated in numerous acts of terrorism for which this district court has held its patron state Iran liable under the FSIA.

The record in this case contains extensive documentary evidence from U.S. intelligence sources connecting Hizballah to Iran and its Ministry of Information and Security.[7] According to the testimony of U.S. Ambassador Robert Oakley[8] who, as Director of Counterterrorism for the Department of State at the time, was directly involved in efforts to effect a military rescue or to induce the Lebanese or Algerian governments to secure the release of the passenger-hostages, the hijackers' initial demands--the release of prisoners in Israel and Kuwait--gave reason to believe they were agents of Amal. As later proved to be the case, however, Amal had employed Hizballah to undertake the actual hijacking, with support from Amal militia on the ground and in

---

[6]"Hitler," whose true name is Mohammed Ali Hamadi, is a Lebanese who was captured, tried from July, 1988, to May, 1989, and convicted in Germany for the hijacking of TWA 847 and the murder of Robert Stethem. He is serving a life sentence in a German prison.

"Crazy" is believed by the U.S. government to be one Izz Al-Din who remains at large. The U.S. government also believes the hijacking to have been planned and directed by Imad Mugineyeh, a Lebanese citizen who may currently serve as Hizballah's chief of security, although his whereabouts are unknown.

[7]Pl. Exs. 5-32.

[8]Tr., 10/22/01, pp. 25-45.

control of the Beirut airport. Further testimony from Robert McFarlane,[9] U.S. National Security Advisor, established that his direct discussions with the leader of Amal (which had taken custody of all the hostages--save Ingalls--from the hijackers in Beirut) had been ineffectual in procuring their release. Not until approval had been given by Iranian President Rafsanjani from Tehran were they turned over to Syrian authorities in Damascus to be released.

IV.

While a foreign state is generally immune from the jurisdiction of the courts of the United States under the FSIA, see 28 U.S.C. § 1604, plaintiffs bring this action against defendants pursuant to section 1605(a)(7) of the Act. That section explicitly authorizes, as an exception to the general grant of sovereign immunity to foreign nations, suits against foreign states that sponsor terrorism for certain acts that cause personal injury or death if either the claimant or victim was a citizen of the United States at the time of the act. See 28 U.S.C. § 1605(a)(7).[10] In numerous suits preceding this action, private claimants have successfully invoked this statutory exception to establish a basis by which federal district courts may exercise subject matter jurisdiction over claims similar to those brought by plaintiffs here against these same defendants. See e.g., Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 20 (D.D.C. 2002); Wagner v. Islamic Republic of Iran, 172 F. Supp. 2d 128, 133-134 (D.D.C. 2001); Jenco v. Islamic

---

[9]Pl. Exs. 34 (videotape deposition); 35 (Tr., 8/29/01).

[10]In relevant part, section 1605(a)(7) of the FSIA authorizes a cause of action for "personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment or agency." 28 U.S.C. § 1605(a)(7).

Republic of Iran, 154 F. Supp. 2d 27, 32-33 (D.D.C. 2001). Plaintiffs' causes of action in this case are predicated on the unlawful detention and torture of plaintiffs, and, in the case of Robert Stethem, his summary execution[11]--acts which unequivocally beget claims eligible for relief under section 1605(a)(7). See 28 U.S.C. § 1605(a)(7) and 28 U.S.C. § 1605 note; see also Jenco, 154 F. Supp. 2d at 32 (claims arising out of the abduction and torture of a Catholic priest actionable under the FSIA); Wagner, 172 F. Supp. 2d at 133-134 (terrorist bombing of the second U.S. Embassy in Beirut and resulting death of a U.S. servicemember constituted an extrajudicial killing for purposes of the FSIA).

The FSIA imposes two preconditions upon the exercise of subject matter jurisdiction by district courts over foreign states: the foreign state must have been designated a state sponsor of terrorism at the time the acts occurred, unless later so designated as a result of such act, and a plaintiff (either claimant or victim) must have been a United States citizen at the time of the incident.[12] See 28 U.S.C. §1605(a)(7)(A) and (B).

Both of these requirements are clearly satisfied here. Iran was designated as a state

---

[11]The murder of Robert Stethem qualifies as an "extrajudicial killing" under the Act: namely, "a deliberate killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples." See 28 U.S.C. § 1605(e)(1) (adopting the meaning given that term in section 3 of the Torture Victim Protection Act of 1991).

[12]Section 1605(a)(7) precludes any action that if taken against United States agents, officials, or employees for similar acts performed in their official capacities within the United States would not be actionable. See 28 U.S.C. § 1605 note. This Court, however, has no difficultly concluding that a suit alleging that United States officials provided material support to individuals who detained and tortured American citizens within the United States, killing one in the process, could be maintained pursuant to 42 U.S.C. § 1983. See also Weinstein, 184 F. Supp. 2d at 22 (citing Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971)).

sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 on January 19, 1984, and remains so designated today. The multiple plaintiffs bringing this action (except Chantal Gautier) have always been United States citizens.[13] Accordingly, the Court finds that it has jurisdiction over the subject matter of this suit and the named defendants.[14] And as the Court has previously found in so many similar cases before it, the evidence conclusively establishes that the Islamic Republic of Iran and its MOIS provided "material support or resources" to Hizballah, and Hizballah and its co-conspirator Amal were the perpetrators of these heinous acts of terrorism. Having concluded that defendants are liable for the tortious conduct alleged, the Court next considers the extent to which the plaintiffs should be compensated for the injuries they sustained as a result of their client organization's unconscionable behavior.

Consistent with its approach in previous FSIA cases involving claims for personal injury or death resulting from state-sponsored terrorism, this Court will evaluate plaintiffs' claims under the federal common law. See Wagner, 172 F. Supp. 2d at 134-135; Sutherland v. Islamic Republic of Iran, 151 F. Supp. 2d 27, 47 (D.D.C. 2001); Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 14-15 (D.D.C. 1998). While the Court will separately analyze the individual claims for compensatory damages brought by each plaintiff below, plaintiffs' claims for punitive damages will be dealt with in the aggregate.

VI.

---

[13]Gautier is Canadian, but her former husband, Clinton Suggs, a U.S. citizen, was a victim to whom she was married at the time..

[14]Pursuant to 28 U.S.C. § 1330 the Court has in personam jurisdiction over defendants because plaintiffs bring their claims against defendants under 28 U.S.C. § 1605(a)(7), and defendants have been properly served in accordance with 28 U.S.C. § 1608.

Compensatory Damages – The Stethem Plaintiffs

Plaintiffs Richard and Patricia Stethem, in their own right, and as personal representatives of the Estate of Robert Dean Stethem, seek compensatory damages for Robert Stethem's wrongful death, his pain and suffering, and solatium for themselves and his surviving brothers and sister. Pursuant to their claim for wrongful death under federal common law, the Estate of Robert Stethem is entitled to monetary damages for funeral expenses and loss of prospective income if Robert's premature death was wrongful and proximately caused by an act of terrorism. See Flatow, 999 F. Supp. at 27 (adopting the elements of the District of Columbia's wrongful death statute, D.C. Code Ann. § 16-2701). As previously shown, agents of the defendants intentionally caused Robert's death. Moreover, it goes with saying that his summary execution was wrongful in that it was carried out by members of a terrorist organization with no legally cognizable basis for taking a life. Therefore, a calculation of the monetary damages actually suffered by Robert's estate is all that remains.

Loss of accretion damages are calculated by estimating a decedent's future earning potential based on the individual's work and education and adjusting that amount to account for inflation, rise in productivity, job advancement, and personal consumption. See Flatow, 999 F. Supp. at 28. Dr. Herman Miller, an economic consultant, testified at trial that Robert's estate experienced economic losses of $904,665.00.[15] In coming to this conclusion, Dr. Miller assumed that, following his service in the Navy, Robert would then attend and successfully complete college to become a civil engineer specializing in underwater construction. The Court finds

[15]Tr., 10/23/01, pp. 3-10; Pl. Ex. 148.

these assumptions and Dr. Miller's corresponding estimation of accretion reasonable; therefore, it will enter an award for pecuniary loss in the amount of $904,665.00 in favor of the Estate of Robert Stethem.[16]

As his personal representatives, the estate is also entitled to recover any damages Robert himself would have been entitled to for the extensive pain he suffered at the hands of the hijackers prior to and in the course of his death. The record is replete with evidence substantiating the Stethems' contention that Robert suffered excruciating pain while being viciously beaten and tortured over the course of fifteen hours. Known to those closest to him as an extremely virile and stoic young man who was able to endure pain without outwardly manifesting discomfort, witnesses testified that Robert cried out on several occasions throughout his ordeal. Particularly telling is the fact that Robert had to be dragged to the front of the plane by his tormentors because of his inability to walk just prior to his being shot in the back of the head. Even then, his suffering did not end. Based upon his finding at autopsy that Robert's lungs continued to function after he had been shot--significant quantities of blood were found to have been aspirated into his lungs--the forensic pathologist Dr. Michael Clark opined that Robert survived the gunshot wound for several minutes.[17]

While pain and suffering is particularly difficult to quantify in terms of assessing damages, the Court can certainly award damages to Robert's estate commensurate with those awards for pain and suffering provided in prior FSIA cases. For purposes of comparison,

---

[16]The Stethems do not seek compensation for funeral expenses: Robert deservedly received a hero's burial at government expense.

[17]Videotape Dep. of Michael A. Clark, M.D. of 10/17/01, Pl. Ex. 100A, B; Pl. Ex. 101.

Robert's suffering occurred in two distinct stages: (1) the pain he experienced from beatings prior to being shot in the head; and (2) the anguish of his final moments anticipating certain death and the pain he experienced after being shot while drowning in his own blood on the tarmac.

With respect to the former, this district court has typically compensated a plaintiff hostage (or his representative) in a FSIA case at a rate of $10,000 per day of captivity accompanied by physical torture. See e.g., Jenco, 154 F. Supp. at 37 (asserting that Congress has tacitly approved this per diem approach to awarding damages for pain and suffering in these cases by declining to take issue with judgments specifically recognized for payment by the United States Treasury in the Victims of Trafficking and Violence Protection Act of 2000); Sutherland, 151 F. Supp. 2d at 51-52; Anderson v. Islamic Republic of Iran, 90 F. Supp. 2d 107, 113 (D.D.C. 2000); Cicippio v. Islamic Republic of Iran, 18 F. Supp. 2d 62, 70 (D.D.C. 1998); Flatow, 999 F. Supp. 1, 14-15. This formulaic approach has not precluded a greater or lesser award in a case where the evidence establishes that the victim of the maltreatment suffered more or less than the hostages in the preceding cases. See e.g., Higgins v. Islamic Republic of Iran, No. 1:99CV00377, 2000 WL 33674311, at *8 (awards totaling approximately $57,000 per day of captivity and torture to the family of an Army colonel held by Hizballah for 529 days prior to being executed); Hill v. Republic of Iraq, 175 F. Supp. 2d 36, 48 (awarding Americans interned by Iraq prior to Desert Storm between $3,000 and $5,000 per day of confinement and additional lump sum awards for psychic injuries sustained as a result); Weinstein, 184 F. Supp. 2d at 23 (awarding $10,000,000, or roughly $178,571 per day, to estate of victim who suffered through severe burn and blast injuries sustained in a terrorist bus bombing without any medication for

pain relief). Notwithstanding, the $10,000 per diem amount serves as a useful benchmark for beginning the damages calculus in a manner that is both just and consistent with previous awards.

In this case, the Court finds that while the time in which Robert was tortured (i.e., fifteen hours) was comparatively much shorter than that of other hostage victims previously considered by this district court, the sheer intensity and frequency of abuse caused Robert to experience a degree of suffering that exceeded that of previous hostages, save perhaps the victims in Higgins and Weinstein. The hijackers were both uncertain and insecure about their ability to control the volatile circumstances inherent in their hijacking of the plane. As a result, they chose to impose an inordinate amount of pain and suffering on Robert as an example to the other passengers should any have been contemplating resistance or revolt. As the uncertainty of the situation escalated, so did the intensity and frequency of the beatings to which Robert was subjected. The Court concludes that Robert's estate is entitled to $500,000.00 for the pain and suffering he endured prior to being singled out for execution.

With respect to the several minutes of anguish and pain Robert endured as and immediately after being shot by Hamadi and thrown from the plane, this district court has previously awarded the estates of terrorist victims suffering similarly brief yet intense pain an amount of $1,000,000. See e.g., Eisenfeld v. Islamic Republic of Iran, 172 F. Supp. 2d 1, 8 (D.D.C. July 11, 2000) (victim of bus bombing who survived attack for several minutes before dying); Flatow, 999 F. Supp. at 29 (same). Likewise, this Court awards Robert's estate the sum of $1,000,000 for this terminal stage of his pain and suffering. In total, the Court will enter a judgment in favor of the Estate of Robert Stethem in the amount of $2,404,665.00.

The Stethem parents also seek loss of solatium damages on behalf of all the Stethems for the bereavement and grief attendant upon their loss of Robert's society and companionship.[18] Because the District of Columbia does not recognize claims for loss of solatium, this Court has recognized this cause of action under the federal common law by relying upon the Second Restatement of Torts: "'[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress.'" Wagner, 172 F. Supp. 2d at 136 (citing Restatement (Second) of Torts § 46 (1986)). All acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror, in their targeted audience: The more extreme and outrageous, the greater the resulting distress. In this case, the agents of Hizballah and Amal engaged in conduct no less extreme than that of their fellow terrorists in earlier cases. Because the Stethems have consequently experienced grave emotional distress from having lost a beloved son and brother, they are entitled to damages for loss of solatium.

In calculating damages for loss of solatium in the case of a deceased family member, this district court has considered a variety of factors to include: (1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death; (4) the nature (i.e., closeness) of the relationship between the

---

[18]While Richard and Patricia are the only Stethems named as plaintiffs in their suit, a decedent's parents have standing on behalf of themselves and their lineal descendants to bring loss of solatium claims. See Flatow, 999 F. Supp. at 30 ("The testimony of sisters or brothers is ordinarily sufficient to sustain their claims for solatium.") Therefore, to the extent that an award for loss of solatium is warranted, Robert's sister, Sheryl Sierralta, and brothers, Kenneth and Patrick Stethem, are also entitled to such damages.

claimant and the decedent; and (5) the duration of the claimants' mental anguish in excess of that which would have been experienced following the decedent's natural death. Flatow, 999 F. Supp. at 30-31. Here, Robert's death was both sudden and unforeseen by his loved ones and the consequences of the terrorists' actions upon them all the more intense. While the Stethems have sought little in the way of professional help to assist them in coping with Robert's death,[19] the enormity of their emotional distress remains evident even to this day.

There is no question based on the evidence presented at trial and the presence and testimony of members of the Stethem family in court that the Stethems have always enjoyed an extraordinarily close familial relationship. Each of the Stethems had a unique and special relationship with Robert and continues to mourn his death on a daily basis in his or her own way. Even 16 years later, the Stethems are unable, in many ways, to move beyond Robert's death. Indeed, the Court accepts Dr. Clark's conclusion that the Stethems will likely remain in the loss and loneliness stage of grief until their own deaths. Moreover, even were they to come to terms with Robert's death, continued media coverage of the events surrounding the hijacking from June 14-15, 1985 (most recently revived in connection with the events of September 11, 2001), serve as constant reminders of their loss.

Although this Court has entertained several solatium claims under the FSIA in other cases arising out of either a hostage taking or wrongful death, only two cases decided by this district

---

[19]In the course of seeking counseling prior to the dissolution of his first marriage, Kenneth was advised by a marriage counselor that he had an adjustment disorder stemming from his inability to cope with Robert's death. He never, however, sought additional counseling. Patrick Stethem tried to seek psychiatric care while in the Navy, but was only seen by chaplains who discouraged him from seeking further help because of concern for its possible effect on his career.

court to date have combined prolonged suffering and death as a result of terrorist acts for purposes of damage awards to next-of-kin. In Higgins, an Army colonel was held captive and viciously tortured by Hizballah for 529 days prior to being executed. See Higgins, 2000 WL 33674311, at *2-3. Recognizing that his immediate family members were painfully aware of the barbaric treatment that the colonel experienced during his long period of captivity before his ultimate demise, the court awarded the colonel's wife and daughter $12,000,0000 each for their loss of his society and companionship. Id. at *8. In Weinstein, a former member of the United States Navy who became an Israeli citizen was severely injured in a terrorist bombing of a public bus in Israel and suffered 49 days from excruciatingly painful burn and blast injuries before dying from them. Weinstein, 184 F. Supp. 2d at 22. The district court awarded the victim's wife $8,000,000 and his three children $5,000,000 each, presumably recognizing that the family was devastated not only from having lost a husband and a father, respectively, but also from having vicariously experienced his suffering during the two months preceding his death. Id. at 23. The Higgins and Weinstein courts correctly acknowledged that anguish is exacerbated when family members must live with the knowledge that their loved ones suffered horribly for an extended period of time either at the hands of their tormentors or as a direct result of their terrorists acts.

Indeed, depending on the duration of captivity, this district court has on occasion awarded greater judgments for claims of loss of solatium to those family members of terrorism victims who were tortured over a prolonged period of time but not killed, see Sutherland, 151 F. Supp. 2d at 51-52 (wife of 6-year hostage received $10,000,000 while three daughters each received $6,500,000); Anderson, 90 F. Supp. 2d at 113 (wife of 6.5-year hostage received $10,000,000 and daughter received $6,700,000); Cicippio, 18 F. Supp. 2d at 70 (wives of hostages each

received $10,000,000); but cf. Jenco, 154 F. Supp. 2d at 37-38 (awarding the siblings of hostage held and tortured for 564 days $1,500,000 each), than to those family members of terrorist victims who expired relatively quickly (although usually suffering intense pain for several minutes) after a single deadly terrorist attack (i.e., bombing, gunshot wound). Eisenfeld, 172 F. Supp. 2d. at 9 (awarding parents of victims of a terrorist bus bombing $5,000,0000 and the siblings $2,500,000 each); Flatow, 999 F. Supp. at 32 (same).

Like the surviving family members in Higgins and Weinstein, the Stethems grieve not only the absence of Robert in their lives, but the knowledge that he suffered greatly prior to being executed. Their grief is tempered only by the knowledge that his suffering was of relatively brief duration, and that he died bravely. Accordingly, the Court will award the Stethem parents $5,000,000 each and the Stethem siblings $3,000,000 each for the loss of Robert's society and companionship.

Compensatory Damages – The Carlson plaintiffs

Plaintiffs Kurt Carlson, Stuart Dahl, Jeffery Ingalls, Clinton Suggs, Tony Watson, and Kenneth Bowen (collectively, the Carlson hostages) seek compensatory damages upon claims in the nature of kidnaping, false imprisonment, torture, assault, battery, intentional infliction of severe emotional distress, and violation of international human rights. Plaintiffs Cheryl Carlson, Martha Dahl, Chantal Gautier, and Pamala Watson (collectively, the Carlson spouses) seek compensatory damages for loss of consortium and solatium. As determined above, this Court holds the defendants responsible for the hijacking of TWA 847 and the attendant hostage taking

and torture of the plaintiff hostages.[20]

Although plaintiff hostages were detained for a period of days as opposed to months or years, they arguably remained captive under conditions entailing even more frequent physical and emotional trauma than that of some of the other plaintiff hostages to come before this Court. Indeed, because the hijackers felt compelled to assert and maintain complete control over the situation, they were tireless and unrelenting in their physical and emotional abuse of their hostages. As evidenced by the summary execution of Robert Stethem in their presence, many of the plaintiff hostages feared the imminent loss of their own lives and were themselves subjected to mock executions (e.g., by firing squad or the dry firing of weapons pointed at their heads) several times during their detention. Even after being removed from the plane, the plaintiff hostages were held under armed guard in inhumane surroundings, witnessed acts of torture and brutality inflicted upon other prisoners, and lived in constant fear for their lives. Because of the terrifying intensity associated with the hijacking itself, as well as their subsequent detention, and the resulting permanent psychic damage they exhibit today, the Court concludes that a per diem calculation of damages is less appropriate than a lump sum award embracing the totality of their experience. Accordingly, this Court will award Kurt Carlson and Clinton Suggs $1,500,000.00 each, and Stuart Dahl, Jeffery Ingalls, Tony Watson, and Kenneth Bowen $1,000,000 apiece for injuries suffered at the hands of the agents of the defendants.

With regard to the claims for loss of consortium by the Carlson spouses, while they were

[20]Because the Court finds that plaintiffs' personal injuries arise from their having been taken hostage and tortured by agents of the defendants (injuries which are specifically compensable under the section 1605(a)(7) of the FSIA), it need not belabor the issue of liability by addressing the independent elements of each separate tort claim advanced by the plaintiffs.

without their husbands for a relatively short period of time, it is clear that the experience has had a detrimental and disturbing effect on their relationships. Their formerly healthy husbands returned estranged and incapable of participating in the marriage with the same physical and emotional warmth they previously displayed. To varying degrees, each of the plaintiff hostages continues to suffer from post-traumatic stress disorder and related behavioral disorders (e.g., violent nightmares, hypervigilance, uncontrollable tempers, impatience) that serve to interfere with their ability to function normally within any social relationship, including marriage. Therefore, this Court concludes that the Carlson spouses are entitled to damages for loss of consortium and solatium and will award them $200,000 each. Compare with Hill, 175 F. Supp. 2d at 48 (awarding spouses of Americans "detained" by Iraqi authorities between $100,000 and $300,000).

Punitive Damages

Plaintiffs also request an award of punitive damages against defendant MOIS for its role in providing support and resources to Hizballah and Amal.[21] As in previous cases, the evidence clearly inculpates MOIS as the instigator and financier of terrorist acts by Hizballah and Amal in this case. The hostage taking, torture, and killing of innocent non-belligerents for political ends constitutes unconscionable conduct in any civilized society. Accordingly, the Court finds that not only are punitive damages authorized under the FSIA to punish the MOIS for its continued role in fomenting terrorist activity, and to the extent possible deter it from future criminal

[21]Punitive damages may not be assessed against the Islamic Republic of Iran, but may be awarded against an instrumentality of a foreign state. See Anderson v. Islamic Republic of Iran, 90 F. Supp. 2d 107, 114 (D.D.C. 2000); Alejandre v. Republic of Cuba, 996 F. Supp. 1239, 1253 (S.D. Fla. 1997).

behavior, see 28 U.S.C. § 1606, but that the MOIS's role in sponsoring the agents responsible for the instant acts of terrorism warrants such an award. Consistent with this Court's prior experience and a calculation equivalent to approximately three times the estimated annual budget of MOIS for support of terrorism as testified to by Dr. Richard Clausen,[22] the Court will assess punitive damages in the amount of $300,000,000 against the MOIS, to be awarded to all plaintiffs jointly and severally.

It is therefore, this 19th day of April, 2002,

ORDERED, that judgment be entered in favor of the plaintiffs against the Islamic Republic of Iran and its Ministry of Information and Security, jointly and severally, for compensatory damages as follows:

| | |
|---|---|
| Estate of Robert Stethem: | $2,404,665.00. |
| Richard Stethem: | $5,000,000.00. |
| Patricia Stethem: | $5,000,000.00. |
| Sheryl Sierralta: | $3,000,000.00. |
| Kenneth Stethem: | $3,000,000.00. |
| Patrick Stethem: | $3,000,000.00. |
| Kurt Carlson: | $1,500,000.00. |
| Cheryl Carlson: | $200,000.00. |
| Stuart Dahl: | $1,000,000.00. |
| Martha Dahl: | $200,000.00. |

---

[22]Tr., 10/22/01, pp. 45-62.

| | |
|---|---|
| Jeffery Ingalls: | $1,000,000.00. |
| Clinton Suggs: | $1,500,000.00. |
| Chantal Gautier: | $200,000.00. |
| Tony Watson: | $1,000,000.00 |
| Pamala Watson: | $200,000.00. |
| Kenneth Bowen: | $1,000,000.00. |

IT IS FURTHER ORDERED, that judgment be entered in favor of plaintiffs, jointly and severally, against the defendant Iranian Ministry of Information and Security for punitive damages in the amount of $300,000,000; and it is

FURTHER ORDERED, that the Clerk of Court forthwith enter judgments in accordance with the foregoing;[23] and it is

FURTHER ORDERED, that plaintiffs may arrange for this Decision and Order to be translated into Farsi and, at plaintiffs' request, the Clerk's Office shall cause a copy of the translated Decision and Order to be transmitted to the U.S. Department of State for service upon defendants through diplomatic channels.

Thomas Penfield Jackson
U.S. District Judge

[23]Civil Action No. 00-159 was filed January 28, 2000. Civil Action No. 00-1309 was filed June 6, 2000. These actions were consolidated for trial pursuant to the Court's Order, dated February 7, 2001. The Court rejects, however, the Carlson plaintiffs' suggestion that for purposes of execution of the judgments both cases be deemed to have been filed on January 28, 2000.